IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 19, 2015 at Knoxville

## STATE OF TENNESSEE v. JARUS SMITH

**Appeal from the Circuit Court for Hickman County**
**No. 12-5132CRB     Timothy L. Easter, Judge**

_____

**No. M2014-01130-CCA-R3-CD – Filed August 6, 2015**

_____

The Defendant, Jarus Smith, appeals as of right from his jury convictions for facilitation of attempted second degree murder, possession of contraband in a penal institution, and two counts of aggravated assault. One count of aggravated assault was merged into the facilitation conviction, and the trial court imposed consecutive terms of ten years for each of the remaining three convictions, resulting in a total effective sentence of thirty years' incarceration. On appeal, the Defendant raises the following issues for our review: (1) whether the evidence was sufficient to support his convictions; (2) whether hearsay statements made by one of the victims were grounds for a mistrial and the curative instructions given were inadequate to address the harm; (3) whether the trial court abused its discretion by denying the Defendant's motion for a continuance; (4) whether the superseding indictment, which added multiple counts of aggravated assault, should been dismissed as violative of the Tennessee Rules of Criminal Procedure; and (5) whether the trial court erred by enhancing the length of his sentencing terms for his facilitation of attempted second degree murder and contraband possession convictions. Following our review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Richard H. Boehms (at trial and on appeal), Duck River, Tennessee; and Derek K. Smith (at trial), Franklin, Tennessee, for the appellant, Jarus Smith.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Kim R. Helper, District Attorney General; and Michael J. Fahey, II, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

This case arises from prison unrest inside the Turney Center Industrial Complex on May 4, 2012, involving the Defendant and fellow inmates, Adam Dansby Frazier and Javoris Sparkman. For their actions, a Hickman County grand jury charged the Defendant, along with Frazier and Sparkman, in August 2012, with four counts of attempted first degree premeditated murder and each separately with one count of possession of contraband in a penal institution. In February 2013, a grand jury issued a superseding indictment, which included the original charges and the additional charges of six counts of aggravated assault.

In October 2013, the trial court conducted a jury trial, and prior to the beginning of that trial, the State dismissed some of the charges. The Defendant, along with Frazier and Sparkman, proceeded to trial on the charges of attempted first degree premeditated murder of prison guard Cody Hellam; attempted first degree premeditated murder of prison guard Paula Miller; possession of contraband in a penal institution; aggravated assault of Officer Miller; and aggravated assault of Officer Hellam.

Investigator Nicky Jordan, a special agent with the Tennessee Department of Correction ("DOC"), Division of Law Enforcement, testified that Turney Center is a "medium/close security facility[,]" meaning that it is "a prison where inmates that have a substantial amount of time go to do that time." According to Inv. Jordan, the prison houses approximately 1,250 inmates with about 128 prisoners per pod, and the guards at Turney Center do not carry weapons because of the high inmate-to-guard ratio.

On May 4, 2012, both Officers Hellam and Miller were working in different areas of the prison and responded from their respective stations to a "code"[1] in Unit 1, Pod B following a disturbance. Pursuant to standard policy, the prison guards were attempting to move all inmates back into their respective prison cells to quell any further uprising. When Officer Hellam arrived in the unit, he heard "a lot of yelling and screaming going on," and he attempted to "hurry up and get everybody locked down, try to contain the situation, get control of it." In so doing, Officer Hellam found himself in the midst of a group of inmates, and "the next thing" that he remembered was "fighting [his] way through" that group. Otherwise, he did not remember many details about the attack

---

[1] At the sentencing hearing, the facts about this prior incident were revealed. Inv. Jordan testified that these same three defendants had been involved in stabbing two other inmates on the lower level of this unit. According to Inv. Jordan, his investigation revealed that Sparkman and Frazier went inside the cell and attacked the inmates, and the Defendant stayed outside the cell acting as a lookout. Inv. Jordan believed this first attack by these defendants was gang-related.

except thinking that "[he] just got punched" and "seeing Officer Miller . . . [being] assaulted by an inmate." Officer Hellam was asked to explain his injuries:

> I received a stab wound to the right side of my head, lost vision in my right eye, hearing in my right ear. They don't know if they can repair it or what's causing all the pain or anything, and they don't know what else they can do. My eyesight returns every so often and then it goes away. Sometimes I can make shapes out and that's it. Like I said, they don't know if they can fix it. Along with PTSD. There's really not much else they can do.

Photographs of his injuries were admitted as trial exhibits, showing a stab wound to the head and bleeding from the ear.

Officer Miller explained that, when she arrived on the second floor walkway of Unit 1, Pod B, she was "stabbed in the face, [she] was stabbed six times across the back and the shoulder[s]," and she was beaten "with a sock full of dominoes." Officer Miller described the facial wound: The "weapon went inside . . . my face, it cut my jaw open, it cut my tongue partial way out, and it's right on the edge of the motor nerve."[2] Photographs of her injuries were also admitted into evidence, showing a jagged, crescent-shaped stab wound to her face, profuse bleeding, and multiple bruises.

Video surveillance footage from Turney Center on May 4, 2012, shows the Defendant, Sparkman, and Frazier standing on a second-floor walkway of Unit 1, Pod B while other inmates wandered about. The Defendant can be seen holding what appears to be a sock within which some sort of weighted object is concealed, and co-defendant Frazier can be seen holding a knife. The Defendant is swaying the sock back and forth as he walks about.

Within a short period of time, the three men encounter another group of inmates along the walkway. The groups come to a standoff, and a fight looms. A short time later, Officer Hellam appears on the walkway and walks from one side to the other, eventually disappearing from view of the camera. He then reappears on the walkway, followed by the Defendant, Sparkman, and Frazier. Around that same time, Officer Miller, who has arrived upstairs, attempts to assist Officer Hellam in separating the two groups by speaking with co-defendant Sparkman.

---

[2] The jury was later instructed to disregard her comments about a "sock full of dominoes" and "it's right on the edge of a motor nerve."

Both officers are now amongst the group of inmates, and co-defendant Sparkman then looks at Officer Hellam and suddenly punches him in the side of the face. Officer Hellam ducks, and the Defendant is visible swinging the weighted sock at him. Officer Hellam escapes from the group, but Officer Miller is now in their midst. Co-defendant Frazier can be seen forcibly stabbing Officer Miller at least three times, while the Defendant swings his weighted sock at her. Officer Miller also manages to escape. However, all three men can still be seen on the walkway strutting together and attempting to progress towards Officer Miller, and the Defendant is still swaying his sock back and forth in an aggressive manner. They only completely stop forward progress once additional officers arrive on the walkway. The Defendant, Sparkman, and Frazier then retreat to a cell. Just before he enters the cell, co-defendant Frazier can be seen tossing something along the walkway. Also, Officer Hellam can be seen staggering across the lower level of the unit where he collapses on the floor. The attack on the two prison guards lasted only seconds.

Other Turney Center correctional officers testified at trial and identified each of the three men and the officers on the surveillance video. These same officers also described the injuries they viewed to Officers Miller and Hellam that day.

Inv. Jordan was also asked about what was classified as "contraband" in the Turney Center. He agreed that some items by their very nature qualified as contraband, like marijuana or a sharp knife, and that an inmate could not have such an item without the express written consent of the chief administrator. Inv. Jordan did not know of any instance where an inmate had been given written consent to possess a knife, and none of these three defendants had said consent from the chief administrator. He described legal items which could be fashioned into a weapon:

> An inmate would be allowed to purchase soap from the commissary in order to take showers, to clean hisself [sic], but he wouldn't be allowed to take that soap and put it in a sock and use it as a battering ram, or an inmate would not be allowed to take items such as gaming—if he was allowed to have domino[e]s and then put those into a sock and use those as a weapon, or pick up rocks off the yard and put them in a sock and use them as a weapon.

He further stated that an item such as a soda can was not contraband "until it [was] used for a purpose other than what it was meant to be" used for, such as assaulting someone. According to Inv. Jordan, the term "weapon" as used in Tennessee Code Annotated section 39-16-201 was "a broad range legal term that [the DOC] enforce[d]." Inv. Jordan explained again, "If he had . . . a legal item and used it as a weapon; therefore, it would become a weapon and contraband."

When Inv. Jordan arrived at Turney Center on May 4, 2012, he found the defendants in Cell 233. Following the attack, a search was performed of all cells in the unit, and Inv. Jordan confirmed that no weapons were found therein, not a knife, sock, or dominoes. Six knives were discovered in the common areas of Unit 1, Pod B, according to Inv. Jordan, but none of them were traceable to any particular inmate.

With this evidence, the State rested. Following the trial court's denial of all of the defendants' motions for judgments of acquittal and the Momon colloquies,[3] the defendants elected not to testify and chose not to present any proof.

Based on this evidence, the jury acquitted the Defendant of the attempted first degree murder of Cody Hellam and convicted the Defendant of the lesser-included offense of facilitation of the attempted second degree murder of Paula Miller. In addition, the jury convicted the Defendant as charged of possession of contraband in a penal institution, the aggravated assault of Officer Hellam, and the aggravated assault of Officer Miller. Co-defendant Frazier was found not guilty of the attempted first degree murder of Officer Hellam, convicted of the lesser-included offense of the attempted second degree murder of Officer Miller, convicted as charged of possession of contraband in a penal institution, convicted as charged of the aggravated assault of Officer Miller, and guilty of the lesser-included offense of facilitation of felony reckless endangerment of Officer Hellam. Co-defendant Sparkman was found not guilty of all offenses except facilitation of the aggravated assault of Officer Miller and simple assault of Officer Hellam.

Following a sentencing hearing, the trial court merged the Defendant's aggravated assault conviction concerning Officer Miller with the facilitation of attempted second degree murder conviction concerning Officer Miller. The trial court thereafter sentenced the Defendant to ten years apiece for the facilitation conviction, for the possession of contraband in a penal institution conviction, and for the aggravated assault conviction concerning Officer Hellam. The three ten-year sentences were to be served consecutively, resulting in a total effective sentence of thirty years' incarceration. Following the denial of his timely motion for new trial, the Defendant filed a timely notice of appeal to this court. This appeal followed.

ANALYSIS

In this appeal, the Defendant contends (1) that the evidence was insufficient to support his convictions; (2) that hearsay statements made by Officer Miller were grounds

---

[3] The trial court was conducting a hearing pursuant to Momon v. State, 18 S.W.3d 152 (Tenn. 1999), which outlined a prophylactic procedure designed to insure that a defendant's waiver of his right to testify is voluntary, knowing, and intelligent.

for a mistrial and that the curative instructions given by the trial court were inadequate to address the harm; (3) that the trial court abused its discretion by denying the Defendant's motion for a continuance; (4) that the superseding indictment, which added additional counts of aggravated assault, should have been dismissed as violative of the Tennessee Rules of Criminal Procedure; and (5) that the trial court erred by enhancing the length of his sentencing terms for his facilitation of attempted second degree murder and contraband possession convictions. We will address each issue in turn.

## I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to support his convictions for facilitation of the attempted second degree murder of Officer Miller, for the aggravated assault of Officer Miller, for the aggravated assault of Officer Hellam, and for possession of contraband in a penal institution. The State responds in kind that the evidence was sufficient for a rational juror to find him guilty of these offenses.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

-6-

## A. Facilitation of Attempted Second Degree Murder

Criminal attempt occurs when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). To qualify as a "substantial step," the person's "entire course of action" must be "corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b). "Second degree murder is . . . [a] knowing killing of another." Tenn. Code Ann. § 39-13-210. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

The Defendant states in the opening section of his brief's sufficiency argument that, "[w]ith the exception of possession of contraband in a penal institution, all of [his] convictions were obtained by way of criminal responsibility." The Defendant then explains what is required for a conviction based upon a theory of criminal responsibility under Tennessee Code Annotated section 39-11-402(2). However, for this offense, attempted second degree murder, the Defendant was convicted of facilitation. "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under [section] 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Therefore, the jury explicitly did not find the Defendant guilty under section 39-11-402(2), and his opening premise regarding his facilitation of attempted second degree murder conviction is inherently flawed. What the Defendant is ostensibly suggesting is that he was not the principal actor in these crimes, except for the possession of contraband in a penal institution conviction.

Turning to the Defendant's argument on facilitation, after quoting the relevant statute, he submits that "[t]here is no evidence" that he "had knowledge that co-defendant Frazier intended to knowingly kill Officer Miller." He cites to the following facts as purportedly in his favor: (1) "There is no evidence that [he] knew that co-defendant Frazier possessed a knife before, during, or after the incident occurred"; (2) "There is no evidence that the co-defendants discussed any plans regarding the incident"; (3) "The [Defendant] had only been in the presence of the co-defendants for less than a minute and a half before the incident took place"; and (4) "There is no evidence that the [Defendant] knew, or even could have known, that Officer Miller would be in the area where the incident occurred when the incident occurred."

The video surveillance footage clearly shows the Defendant moving back and forth along a prison walkway while rocking the weighted sock in his hand for more than

-7-

one minute before the attack on Officer Miller. The Defendant is accompanied by co-defendant Frazier who visibly has a knife in his possession and co-defendant Sparkman. Their movements can only be described as pompous and boisterous. The three men come to a standstill with another group of inmates on the walkway, with violence impending. Officer Miller proceeds upstairs to stop a fight from breaking out and attempts to separate the two groups, and Officer Hellam approaches from an opposite way of entry. Officer Miller speaks with co-defendant Sparkman, trying to calm him down and diffuse the situation according to trial testimony. At that point, the two officers have come together, and co-defendant Sparkman looks at Officer Hellam and punches him in the side of the face. The Defendant immediately begins swinging his weighted sock at both officers, and co-defendant Frazier can be seen forcibly stabbing Officer Miller at least three times.

Officer Miller testified that the knife entered the side of her face, "cut [her] jaw open, [and] . . . cut [her] tongue partial way out." Photographs admitted into evidence showed a large, jagged, crescent-shaped wound to the right side of Officer Miller's face, which was unquestionably severe. Those same photographs also showed multiple bruises to Officer Miller's body, and the jury could logically infer that these injuries were caused by blows from the Defendant's sock. Fortunately, both officers were able to escape from the defendants, although the defendants only backed down once additional officers arrived on the walkway. After the attack, all three men can still be seen on the walkway strutting together, and the Defendant is still swaying his sock back and forth in an aggressive manner. As evidenced by the Defendant's actions, and given the unprovoked, frenzied nature of the attack, the jury was certainly free to infer that the Defendant furnished substantial assistance to co-defendant Frazier in his attempt to knowingly kill Officer Miller. Viewing this evidence in the light most favorable to the prosecution, we hold that the evidence adduced at trial supports the Defendant's conviction for facilitation of attempted second degree murder.

## B. Aggravated Assault

Intentionally or knowingly causing bodily injury to another is an assault. Tenn. Code Ann. § 39-13-101(a)(1). An assault is aggravated if it "involved the use or display of a deadly weapon." Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii). A "deadly weapon" is defined as: "(A) A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or (B) Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-11-106(a)(5). Here, both the indictment and the jury charge provided a specific weapon, "to-wit: a prison-made knife."

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal

responsibility for the actions of another arises when a defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2); State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.").

*1. Officer Miller.* Before we address the sufficiency of the evidence supporting this conviction, we must first briefly address whether the trial court properly merged this aggravated assault conviction with the facilitation of attempted second degree murder conviction. For the first time on appeal, the State argues that the trial court erred in this regard. Citing to the sentencing hearing, the Defendant responds that "the State waived the merger argument by agreeing to the merger at trial." We agree with the Defendant that the State has waived the issue.

At the outset of the sentencing hearing, the assistant district attorney general stated, "I guess I'll go ahead and get to this point here, the aggravated assault in count VI, Your Honor, I believe would merge with count II." Upon questioning by the trial court, the assistant district attorney general acknowledged that aggravated assault was not a lesser-included offense of facilitation to commit attempted second degree murder and that he had no case law to support a position that merger was appropriate. Later in the sentencing hearing, the assistant district attorney general actually presented the trial court with two cases from 2001 supporting merger. In issuing its sentencing determination, the trial court stated,

> So I am not going to make a large deal out of [merger] because the State is not pushing it. In fact, the State seems to agree with the [d]efense. But I don't think it is as clear as the State wants the [c]ourt to—and the [d]efense. I think it's an open question. But since the State is not pushing it and not seeking it I'm not going to—I won't push it either and we'll go with the State's argument on this, that the count VI merges.

In addition to the comments at the sentencing hearing, we note that in the Bill of Particulars, it is stated, "The offense alleged in the indictment is attempted first degree murder, and alternatively, aggravated assault." The Bill of Particulars was actually entered as a trial exhibit and submitted to the jury for its consideration in assessing guilt.

The State's brief does not include any reference to the language of the Bill of Particulars and completely omits the steps taken by the assistant district attorney general to advocate for merger of the two counts at the sentencing hearing. The same rules that

apply to defendants likewise apply to the State. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). "When an issue is raised for the first time on appeal, it is typically waived." State v. Maddin, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005); see also Simpson v. Frontier Cmty. Credit Union, 810 S.W.2d 147, 153 (Tenn. 1991) ("[I]ssues not raised in the trial court cannot be raised for the first time on appeal.") (citations omitted). The Attorney General's Office on appeal apparently disagrees with the assistant district attorney general's concession in the trial court that the two offenses merged. Regardless, "[b]ecause the State failed to present this argument in the trial court, the trial court did not have the opportunity to pass on it, and we will not consider it." State v. Charles A. Kennedy, No. M2013-02207-CCA-R9-CD, 2014 WL 4953586, at *10 (Tenn. Crim. App. Oct. 3, 2014). Accordingly, we decline to address this issue.

Although the convictions merged, the Defendant can still challenge the sufficiency of the evidence supporting the separate convictions. See State v. Jose Lemanuel Hall, Jr., No. M2013-02090-CCA-R3-CD, 2014 WL 4384318, at *12 (Tenn. Crim. App. Sept. 5, 2014) (citation omitted), perm. app. denied (Tenn. Jan. 16, 2015). In challenging the sufficiency of the evidence supporting his conviction for aggravated assault of Officer Miller, the Defendant states that his "conviction for this crime came under the theory of criminal responsibility, as there was no evidence at any point that he actually possessed a knife." He then submits that there was insufficient proof that he intended to promote or assist co-defendant Frazier in the attack on Officer Miller, noting that "there [was] no proof that he knew an aggravated assault was about to take place"; "[a]t no point in time was it ever proven that the [Defendant] knew that co-defendant Frazier possessed a knife; "[n]or did the video show that the [Defendant] was promoting or assisting the offense, as the [Defendant] was acting on his accord, not to promote or assist anyone else."

Much of the same evidence cited above in support of the facilitation to commit attempted second degree murder conviction also supports the Defendant's conviction for the aggravated assault of Officer Miller by using or displaying a prison-made knife. His main argument in this regard was that the evidence is insufficient to support a theory of criminal responsibility. However, the evidence cited above supports a theory of criminal responsibility, in addition to facilitation. See also State v. Kevin L. Buford, Sr., No. M2010-01618-CCA-R3-CD, 2012 WL 1895953, at *21 (Tenn. Crim. App. May 24, 2012) ("Inconsistent jury verdicts are an accepted fact of our legal system and have never, standing alone, provided any legal basis for a challenging the sufficiency of the evidence used to convict a defendant."). It is clear from the video recording that these three defendants were acting in concert based upon their actions before, during, and after the attack on these two officers, each with full awareness of the other's participation. A reasonable juror could conclude that the Defendant promoted or assisted co-defendant

-10-

Frazier in the commission of the offense by swinging his weighted sock at the officers, aiding co-defendant Frazier in his efforts to stab Officer Miller. Again, co-defendant Frazier can be seen with the knife in his hand prior to the standoff with the other group of inmates.

The Defendant's statement that the video did not "show that [he] was promoting or assisting the offense, as [he] was acting on his accord, [and] not to promote or assist anyone else[,]" insinuates that the jury could have found him guilty only as a principal actor and not under a theory of criminal responsibility. While a jury could logically infer that Officer Miller's multiple bruises were caused by blows from the Defendant's swinging the weighted sock, such possibility of guilt was not charged to the jury due to the State's designation of a specific weapon for the aggravated assault offenses. The Defendant's misdeeds also support a conviction under a theory of criminal responsibility for the actions of his co-defendant using or displaying a prison-made knife. The evidence, viewed in the light most favorable to the State, was sufficient to support the Defendant's conviction for the aggravated assault of Officer Miller.

*2. Officer Hellam.* Regarding his sufficiency argument for this aggravated assault conviction, the Defendant first notes that co-defendant Frazier "was the main actor in possession of the prison made knife" and that the jury found Frazier not guilty of the aggravated assault of Officer Hellam, but only of facilitation of the reckless endangerment of Officer Hellam. The Defendant reiterates, "[T]here was never any evidence that the [Defendant] ever possessed a knife during the incident[,]" and "[t]herefore, any guilt on behalf of the [Defendant] would have to be under a theory of criminal responsibility for the actions of one or both of the co-defendants." He further notes that co-defendant Sparkman was found guilty only of simple assault with regard to Officer Hellam. The Defendant surmises, "In order to be found guilty under a theory of criminal responsibility, the State must prove all of the elements of the principal offense[,]" and the State did not do so here because both co-defendants were acquitted of that offense.

He continues that the State failed to "prove that any weapon was actually used in the attack on [O]fficer Hell[a]m. However, if [this] court finds that a weapon was used, the State also did not prove that the weapon was a deadly weapon per the statutory definition" because "[s]everal prison made knives were found after the incident in the general area, but none were specifically linked to the incident involving [O]fficer Hell[a]m." In conclusion, he asserts that, even if all of the statutory elements of aggravated assault are deemed sufficient, "the State did not prove criminal responsibility beyond a reasonable doubt" again because there was no proof that he intended to promote or assist anyone, "as he himself was directly involved in the incident."

-11-

The Defendant initially appears to be arguing that one cannot be convicted pursuant to a theory of criminal responsibility if there was no other person who was guilty as the principal. However, he states in his reply brief that he "is not attempting to claim a defense based on the failed conviction of the two co-defendants[.]" In order to quickly dispense with any issue in this regard, we agree with the State that the Tennessee legislature has specifically addressed such situation and excluded any defense put forth by the Defendant on this ground. See Tenn. Code Ann. § 39-11-407.[4]

The Defendant claims that, because his co-defendants were found not guilty of the principal offense, the State failed to establish all of the essential elements of the offense, mainly that the State failed to prove that a prison-made knife was used in the attack on Officer Hellam. The attack began when co-defendant Sparkman punched Officer Hellam in the face, and the Defendant can then be seen swinging his sock at both officers. No one was seen stabbing Officer Hellam on the recording. However, Officer Hellam testified at trial that he "received a stab wound to the right side of [his] head," losing vision in his right eye and hearing in his right ear. A photograph of his stab wound was entered as an exhibit. Because a weapon was never found does not mean that the State failed to prove that one was used. Officer Hellam's testimony, supported by the photographs, was sufficient to establish that a deadly weapon was used during his assault. We again reject the Defendant's challenge to the theory of criminal responsibility because he was only a principal actor for the reasons explained in the subsection above. Sufficient evidence supports the jury's verdict for the aggravated assault of Officer Hellam based on a theory of criminal responsibility.

### C. Possession of Contraband in a Penal Institution

At the time of the offense, Tennessee Code Annotated section 39-16-201, "Introduction or possession of weapons, explosives, intoxicants or drugs into a penal institution where prisoners are quartered" provided, in pertinent part, as follows:

(b) It is unlawful for any person to:
(1) Knowingly and with unlawful intent take, send or otherwise cause to be taken into any penal institution where prisoners are quartered or

---

[4] This section provides as follows:

In a prosecution in which a person's criminal responsibility is based upon the conduct of another, the person may be convicted on proof of commission of the offense and that the person was a party to or facilitated its commission, and it is no defense that . . . [t]he person for whose conduct the defendant is criminally responsible has been acquitted, has not been prosecuted or convicted, has been convicted of a different offense or different type or class of offense, or is immune from prosecution.

Tenn. Code Ann. § 39-11-407(2).

-12-

under custodial supervision any weapons, ammunition, explosives, intoxicants, legend drugs, or any controlled substances found in chapter 17, part 4 of this title; [or]

(2) Knowingly possess any of the materials prohibited in subdivision (b)(1) while present in any penal institution where prisoners are quartered or under custodial supervision without the express written consent of the chief administrator of the institution[.]

Tenn. Code Ann. § 39-16-201. Here, both the indictment and the jury charge provided the specific weapon, "to-wit: [a] hard, blunt object wrapped in a garment or cloth."

The Defendant notes that neither the "hard, blunt object" nor the sock in which is it was carried were ever found; that, although Inv. Nicky Jordan was called to testify, the Chief Administrator of the Turney Center was not; and that there was not "any evidence admitted regarding whether or not [he] had permission to be in possession of the object he was carrying." The Defendant continues that "[t]he State never proved exactly what this object was," and therefore, "per the testimony of the State's own witness, [C]hief [I]nvestigator Nicky Jordan, it [was] entirely possible, even probable, that [he] was carrying an object that he could legally possess inside the prison." Using this logic, he submits that the State offered no proof that he possessed the items without the express written consent of the chief administrator of the institution. He further argues that there was insufficient circumstantial evidence for a juror to reasonably find that he lacked said consent because there was no proof that he attempted to conceal the weapon. In support of this argument, the Defendant cites to several cases: State v. Jonathan C. Carr, No. M2007-01759-CCA-R3-CD, 2008 WL 4368240, at *7 (Tenn. Crim. App. Sept. 26, 2008); State v. Mitchell Eads, No. E2006-02793-CCA-R3-CD, 2008 WL 2790434, at *5-6 (Tenn. Crim. App. July 21, 2008); State v. Jeffrey W. Osborne, No. 01C01-9807-CC-00292, 1999 WL 961384, at *4-5 (Tenn. Crim. App. Oct. 22, 1999); and State v. Jimmy Cullop, Jr., No. 03C01-9607-CR-00281, 1997 WL 119553, at *2 (Tenn. Crim. App. Mar. 18, 1997). The Defendant then contends that this is an issue of first impression and takes us down a path of statutory interpretation analysis.

The Defendant's argument is flawed in many respects. First, if the weighted sock object is not a weapon, there is no need to engage in any further analysis because a conviction cannot stand. However, many items may have once been mundane but were then manufactured by inmates into weapons. Engaging in a statutory construction analysis under a different statutory scheme, this court has held that "possession of a dangerous weapon by a jailed inmate is equally dangerous whether that weapon was imported into the jail for an unlawful purpose, or was converted to such an unlawful purpose after it was innocently introduced, or was manufactured by the inmate on the

-13-

premises." State v. Harrison, 692 S.W.2d 29, 31 (Tenn. Crim. App. 1985). The same rationale holds true now.

The Defendant can be seen on the video footage forcibly swinging a weighted sock at both of the officers. It appears from the photographs that Officer Miller suffered bruises from the weapon utilized by the Defendant. To exclude this non-traditional weapon because it was comprised of formerly legal prison materials would lead to an absurd result; a "shank" or prison-made knife would also likely be made of formerly ordinary prison material such as metal or a toothbrush. See, e.g., State v. James Anthony Hill, No. M2003-00516-CCA-R3-CD, 2004 WL 431481 (Tenn. Crim. App. Mar. 9, 2004) (holding that evidence was sufficient to support possession of a weapon in a penal institution despite defendant's argument that sharpened piece of metal confiscated from him was not designed or adapted for the purpose of inflicting bodily injury, but rather as a tool for removing toilet paper from his air conditioning vent). This court has held that "'weapon' is not a technical term which requires legal research to determine its meaning; in this context, its meaning can be ascertained by [a] person of common intelligence." Id. at *6 (quoting State v. Joseph John Henry Morrell, No. E1999-00924-CCA-R3-CD, 2000 WL 218188, at *2 (Tenn. Crim. App. Feb. 25, 2000)). Furthermore, there is no requirement for the weapon to be found, only for it to be possessed by a defendant, which it clearly was as seen on the video recording here.

Next, we address what proof or testimony is required regarding consent from the chief administrator of the jail. The last clause of Code section 39-16-201(b)(2) works as an exception to unlawful possession of contraband in a penal institution, meaning that a prisoner could possess the prohibited items with the express written consent of the chief administrator of the institution. Direct testimony from the chief administrator that he or she had in fact not given consent to a defendant has never been a requirement this court has imposed upon the State. Prior panels of this court have upheld convictions under this statute, "absent testimony from any administrative personnel within a given jail system, as long as a 'jury had a rational basis for its conclusion [of lack of consent] even though the [S]tate did not establish by positive proof that consent had not been provided by the chief administrator of the institution.'" Osbourne, 1999 WL 961384, at *4 (emphasis added) (citing Cullop, 1997 WL 119553, at *3).

We turn to an analysis of the cases cited by the Defendant. In Cullop, the keeper of the records at the Sullivan County Sheriff's Department had the responsibility of supervising all entries into inmate files and testified that nothing in the defendant's file indicated that the chief administrator of the jail had authorized the possession of the marijuana. This court held that the absence of an entry of administrative consent "is direct proof that the chief administrator had not given his consent." Cullop, 1997 WL 119553, at *2 (citation omitted). In Osbourne, the State presented testimony from the

Captain of the Williamson County Sheriff's Office. Although the Captain correctly testified in that case, that the ultimate authority for the jail, as for all aspects of the Sheriff's Department, rested with the Williamson County Sheriff, the Captain's testimony established that he administrated the jail. Thus, the court concluded that the Captain qualified as a "chief administrator" for purposes of the statute. Osbourne, 1999 WL 961384, at *5. The Osbourne court further noted, "We do not find that the phrase 'chief administrator' of a jail has a 'technical meaning' beyond the capabilities of the jurors to conclude who is responsible for the day-to-day maintenance of the jail absent a special instruction.'" Id. (citing State v. McAfee, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987)). Moreover, in Eads, the State presented direct testimony from the administrator of the jail that the defendant did not have permission to have the weapon in the facility. Eads, 2008 WL 2790434, at *6. The Carr case is the only case cited by the Defendant that actually affirmed the conviction based solely on circumstantial evidence surrounding that defendant's conduct concealing the evidence, thus permitting a reasonable juror to conclude that the defendant therein lacked permission to possess the contraband. Carr, 2008 WL 4368240, at *7.

The Defendant attempts to distinguish his case on its facts by pointing out that he brandished the weighted sock out in the open and made no attempts to conceal the weapon when confronted by the prison guards on the walkway. However, the Defendant's case is markedly similar to the facts in Eads. In Eads, the defendant argued on appeal that the State had failed to present testimony from the chief administrator of the jail establishing that he did not have his express written consent to possess the weapon and that there was insufficient circumstantial evidence from which a jury could conclude that he lacked the express written consent of the sheriff because there was no proof that he attempted to conceal the weapon. The court held,

> We agree with the State, however, that the mere fact that the defendant openly brandished the weapon when executing his escape does not mean that he made no attempts to conceal it prior to that time. No proof was presented that the defendant, prior to the time of his escape, ever flaunted the weapon in front of correctional officers or staff. The jury reasonably could have inferred from the evidence that the defendant kept the weapon concealed on his person or in his cell, surreptitiously used it to saw through his cell door, and openly brandished it only when the right opportunity presented itself for his escape.

Eads, 2008 WL 2790434, at *5.

In the present case, the more likely inference of concealment comes after the attack on Officers Miller and Hellam. The fact that the weapon was never found works

-15-

against the Defendant rather than in his favor as he would suggest. The disappearance of the weapon raises a plausible inference that he knew possession of the objects were prohibited and that he later secreted the items from capture or returned them to their proper place of origin in an effort to avoid detection. In his reply brief, the Defendant submits that there was no proof that the object ever in fact disappeared, and even if disassembled, "it still would have been found in a search of the Defendant's cell." The testimony elicited by defense counsel at trial directly contradicts this assertion. Defense counsel asked Inv. Jordan if the inmates' cells were searched and if dominoes or a sock were found in the Defendant's possession. Inv. Jordan stated an initial search was conducted, but they "didn't know that there was a sock" involved in the attack at that time. After reviewing the video footage, the officers searched again and found no sock or dominoes in the Defendant's possession.

Additionally, there was more than just circumstantial evidence of concealment. There was also the testimony of Inv. Jordan that the item in question qualified as contraband. At the time of the Defendant's trial, Inv. Jordan worked for the Commissioner of the Department of Correction as one of three special agents investigating criminal activity in prisons in Middle Tennessee. Prior to his current job, Inv. Jordan had worked at Turney Center specifically for twenty-five years, beginning as a correctional officer and working his "way through the ranks." For approximately the last ten years of his employment at Turney Center, he served as an institutional investigator working "directly for the warden investigating administrative and criminal matters[.]"

The Defendant mischaracterizes Inv. Jordan's testimony. Inv. Jordan clearly stated that any ordinary object permitted inside the prison once fashioned into a weapon or used as a weapon was illegal and considered contraband for purposes of the statute. Inv. Jordan also knew of no express written consent given by the chief administrator for any of these three defendants to be in possession of a knife. The Defendant has not provided any rational basis for the jury to conclude that he had obtained express written consent from the chief administrator to fashion legal items into a weapon that he had only recently used to swing at Officers Miller and Hellam. The Defendant's argument is circular, returning to the question of whether the object is in fact a weapon or contraband; an argument which we have already addressed and found to be without merit.

While Inv. Jordan was not the chief administrator of the penal institution, he certainly had access to the jail records, which evidenced an absence of any written consent, and had knowledge of the internal practices and procedures of the Turney Center. His testimony was sufficient to establish that the Defendant lacked any express written consent to possess the weapon by the chief administrator. We conclude,

therefore, that the evidence, viewed in the light most favorable to the State, was sufficient to sustain the Defendant's conviction for possession of contraband in a penal institution.

## II. Officer Miller's Statements

The Defendant also challenges two statements made by Officer Miller during her direct examination. The first statement occurred when Officer Miller was asked to describe the injuries she sustained that day during the prison violence. In giving this description, she made the statement that she "was beat with a sock of dominoes." Defense counsel objected, and a jury-out hearing was held.

Officer Miller admitted that, at the time of the beating, she did not know what she was being hit with. When asked how she knew it "was a sack full of dominoes[,]" Officer Miller replied because she had seen the Defendant swinging "[a] white object with bulk in his hand" on the video recording and because she "was later told [by someone] that it was dominoes." The jury returned to the courtroom, and because the statement was violative of the hearsay rule, the trial court gave the following curative instruction:

> Ladies and gentleman, you may recall from my instructions yesterday afternoon I told you there may come a point when I would tell you to disregard something that a witness testified to. This witness testified that she was hit with a sack full of dominoes. I'm going to ask you to disregard that testimony.

Defense counsel never requested a mistrial. The issue was raised in the Defendant's motion for new trial, but no specific argument or ruling occurred on the issue.

The Defendant concedes that he never objected to the curative instruction by requesting a mistrial due to the overly prejudicial nature of Officer Miller's hearsay comment about "a sack full of dominoes." See Tenn. R. App. P. 36; State v. Robinson, 971 S.W.2d 30, 42-43 (Tenn. Crim. App. 1997) ("[F]ailure to make a contemporaneous objection or motion for mistrial constitutes a waiver of the issue absent the existence of plain error."). However, the Defendant then makes no argument that this court should review the issue for plain error, and we see no reason to do so sua sponte because a jury is presumed to have followed a trial court's curative instruction, see State v. Reid, 164 S.W.3d 286, 342 (Tenn. 2005) (citation omitted). This issue is waived.

Second, during Officer Miller's testimony, she described her facial injuries, stating that the stab wound to her face partially severed her tongue and that "it's right on the edge of the motor nerve." Co-defendant Frazier's counsel objected, citing the lack of foundation for this medically-based assertion, and the trial court initially overruled the

objection, stating, "[Y]ou've admitted that your client assaulted this woman; aggravated assault." A jury-out hearing followed, and co-defendant Frazier's counsel argued,

> [T]he State charged [Frazier] with aggravated assault with a deadly weapon. They specified exactly the manner in which they wished to find [Frazier] guilty of aggravated assault. We have conceded, we have pled guilty that with a deadly weapon as defined, he assaulted Ms. Miller.[5] We have not ever conceded that what Ms. Miller sustained was serious bodily injury. Its relevance could indicate for the attempted murder aspect of this trial, but only upon qualified evidence . . . but [Ms. Miller] is not entitled to now testify to medical evidence as to how close she came to death. The jury now has that inference, and I would move for a mistrial based on what the jury has just been told.

The trial court denied the co-defendant Frazier's request for a mistrial, brought the jury back into the courtroom, and gave the following instruction:

> Ladies and gentlemen, you may recall yesterday afternoon, after the charges were read to each individual defendant, Mr. Bates, on behalf of [co-defendant Frazier], entered a plea to the charge of aggravated assault involving Ms. Miller.
> The allegation that has been made in the indictment on that particular charge states that [the defendants] caused bodily injury to Paula Miller by use of a deadly weapon, to wit: A prison-made knife.
> The legal definition of bodily injury is—and you'll get this again in the charge, but I wanted to give it to you now based upon some testimony that just occurred—but the legal definition for bodily injury is—or it includes a cut, abrasion, bruise, burn or disfigurement, physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty.
> Her testimony to you regarding the damage of a nerve, I'm going to ask you to disregard that evidence and strike that from testimony.

Again, the issue was raised in the Defendant's motion for new trial, but no specific argument or ruling occurred on the issue. On appeal, the Defendant argues that he was prejudiced by this statement "because his conviction for facilitation of attempted second degree murder was based off of co-defendant Frazier's conviction for attempted second degree murder. . . . This statement unduly prejudiced the jury due to the medical nature of

---

[5] The trial court did not thereupon accept the plea, and the aggravated assault charge was submitted to the jury.

-18-

the statement by a lay witness with no established medical knowledge." Accordingly, he submits that the trial court's instruction to the jury was insufficient to mitigate the damage caused by Officer Miller's statement.

A mistrial should be declared only if there is a manifest necessity for such action. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The burden of establishing a "manifest necessity" lies with the party seeking the mistrial. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). When determining whether a "manifest necessity" exists, "no abstract formula should be mechanically applied and all circumstances should be taken into account." State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993) (quoting Jones v. State, 403 S.W.2d 750, 753 (Tenn. 1966)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." Williams, 929 S.W.2d at 388. A trial court's decision regarding whether to grant a mistrial will only be overturned upon a showing of an abuse of discretion. Id.

As stated previously, a jury is presumed to have followed a trial court's curative instruction. See Reid, 164 S.W.3d at 342. Moreover, Officer Miller's statement that the facial wound was "right on the edge of the motor nerve" was relatively innocuous as "medical knowledge." Also, the jury was shown video recordings of Officer Miller repeatedly being stabbed and photographic evidence of her resulting injuries. We conclude that the trial court did not abuse its discretion by denying the co-defendant's request for a mistrial in this regard.

### III. Motion to Continue

Next, the Defendant argues that the trial court abused its discretion by denying his motion to continue. His entire argument is as follows:

> In the weeks leading up to the trial, Defendant's counsel made an oral motion to continue so that the [Defendant] could have more time to hire more experienced counsel. This motion was denied by the trial court, but no order was entered regarding this decision. [The Defendant's] appointed attorney was appointed elbow counsel, but was not given a continuance of the court date.

The Defendant has failed to include in his brief to this court any citations to the record, any citations to legal authority to support his contentions, and any argument beyond the cursory sentences quoted above. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to

the record will be treated as waived in this court."); <u>see also</u> Tenn. R. App. P. 27(a)(7)(A). His failure to cite to the record gives us even further pause when he admits that there is no motion or order in the technical record and we are without any transcript of a hearing where a motion to continue was ever addressed. The Defendant has failed to ensure an adequate record for our review, such being his duty. <u>See</u> Tenn. R. App. P. 24(b). For multiple reasons, the Defendant has waived full appellate review of this issue.

*IV. Motion to Dismiss the Indictment*

The Defendant contends that the trial court erred by denying his motion to dismiss the superseding indictment, which charged him with six counts of aggravated assault. He states that, on October 15, 2013, he filed a motion to dismiss four counts of aggravated assault charged in the superseding indictment, two of which were dismissed prior to trial, according to the Defendant.[6] He submits that "[t]he basis for this motion was that the counts of aggravated assault were not brought until a superseding indictment was filed over six months after the original indictment." In support of his contention, he cites to Rule 8 of the Tennessee Rules of Criminal Procedure, which governs mandatory joinder of offenses when the offenses are "based on the same conduct or arise from the same criminal episode"; and to Rule 48(b) of the Tennessee Rules of Criminal Procedure, which provides that the trial court may dismiss the indictment "[i]f there is unnecessary delay in presenting the charge to a grand jury against a defendant who has been held to answer to the trial court, or if there is unnecessary delay in bringing a defendant to trial."

It does appear from the record that the motion was heard on October 15, 2013, because the record does include a November 1, 2013 order from the trial court denying the Defendant's motion, wherein the trial court references the hearing. In ruling on the motion, the trial court reasoned as follows:

> The length of the delay in filing the super[s]eding indictment was not unreasonable in that it was filed less than a year from the date of the offense. The reasoning for the super[s]eding indictment is not unreasonable in that it allows the jury to be instructed on a charge lesser in severity than attempted premeditated murder. And, there is no prejudice to the [D]efendant resulting from the super[s]eding indictment.

---

[6] The Defendant appears to be incorrectly stating that there were four counts of aggravated assault in total that were added by the superseding indictment. Instead, it was six counts involving four victims that were added; thus, two counts involved alternative theories of guilt for the other two victims not involved in this case (using a deadly weapon or causing serious bodily injury). All four of those counts involving the other two victims were dismissed prior to trial. Those four counts involved the two inmates that these three co-defendants stabbed immediately prior to the attack on the prison guards, but those two inmates refused to testify against the defendants.

Nonetheless, no motion to dismiss stating the grounds for relief is included in the technical record presented to this court, and we are again faced with a situation where the Defendant makes no citation to the record and we are without any transcription of the motion hearing. We agree with the State that the Defendant has failed to provide an adequate record on appeal and that waiver of appellate review is appropriate. See Tenn. R. App. P. 24(b); Tenn. Ct. Crim. App. R. 10(b).

### *V. Sentencing*

The Defendant contends that the trial court "misapplied the statutory enhancing and mitigating factors" to increase his sentences for facilitation of attempted second degree murder and possession of contraband in a penal institution to the maximum term within the applicable range.[7] Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). To facilitate appellate review, "it is critical that [a] trial court[] adhere[s] to the statutory requirement set forth in Tennessee Code Annotated section 40-35-210(e)" and articulates in the record its reasons for imposing the specific sentence. State v. Bise, 380 S.W.3d 682, 705 n.41 (Tenn. 2012).

The Defendant challenges the imposition of the maximum sentence for his convictions for facilitation of attempted second degree murder and possession of contraband in a penal institution. The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing." Id. at 708. Currently, upon a challenge to the length of the sentence imposed, it is the duty of this court to analyze the issues under "an abuse of discretion standard of review, granting a

---

[7] The State quotes a phrase in the Defendant's brief, "that the sentences he received were excessive[,]" and then uses that quote to infer that the Defendant may also be challenging the consecutive nature of his sentences and goes on to address that issue. We decline to make this inference because the Defendant states that he is "specifically" challenging the trial court's application of the statutory enhancing and mitigating factors. Accordingly, we will not address the consecutive nature of the Defendant's sentences. See Tenn. R. App. P. 27(a)(7)(A) (stating that the Defendant's brief must contain an argument "setting forth [his] contentions . . . with respect to the issues presented, and the reasons therefore, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on"); see also Tenn. Ct. Crim. App. R. 10(b). We also note that the Defendant makes no challenge to his ten-year sentence for the aggravated assault of Officer Hellam; therefore, any challenge to that sentence is also waived for the same reasons.

presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2007). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

Our amended Sentencing Act no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. Tennessee Code Annotated section 40-35-210 was amended to provide as follows:

> (c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.
> (d) The sentence length within the range should be consistent with the purposes and principles of this chapter.

Tenn. Code Ann. § 40-35-210(c), (d) (emphasis added).

"[T]he 2005 amendments rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by— but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." Bise, 380 S.W.3d at 706. In accordance with the broad discretion now afforded a trial court's sentencing decision,

> misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with

-22-

the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

Id.

The Defendant was a Range II, multiple offender who was convicted of Class C felonies; therefore, he was subject to a sentence between six and ten years on each count. See Tenn. Code Ann. § 40-35-112(b)(3). The trial court found that three enhancement factors applied to both of the Defendant's convictions for facilitation of attempted second degree murder and possession of contraband in a penal institution: (1) the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (10) the Defendant had no hesitation about committing a crime when the risk to human life was high; and (13) at the time the felony was committed, the Defendant was incarcerated in a penal institution on a felony conviction. See Tenn. Code Ann. § 40-35-114(1), (10), & (13). The trial court also applied enhancement factor (6), "The personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great[,]" to the Defendant's facilitation of attempted second degree murder conviction. See Tenn. Code Ann. § 40-35-114(6). The trial court then considered the Defendant's evidence in mitigation and found that none applied. See Tenn. Code Ann. § 40-35-113.

At the sentencing hearing, it is clear that the Defendant's presentence report was admitted as an exhibit. However, the presentence report is not a part of the record on appeal. At this juncture, and in light of waiver of many of the Defendant's previous issues, we feel the need to address the multiple inadequacies of this appellate record, and this court's attempts to remedy them.

On April 15, 2015, this court ordered that the appellate record be supplemented with the trial and sentencing exhibits, the motion for new trial, and the renewed motion for judgment of acquittal; all of which were missing from therein and without which we would be unable to review the sufficiency of the evidence, the Defendant's sentencing issues, or determine if we had jurisdiction over his remaining issues. This order was filed after the State had filed its responsive brief noting the various defects in the appellate record and arguing for waiver of many of the Defendant's issues due to those defects. By this time, the Defendant had also filed a reply brief but had not sought to supplement the record with any of the items pointed out by the State or any of the items later requested by this court. On April 29, 2015, we received a letter from the trial court clerk stating that "the missing exhibit and the motions for new trial" were enclosed. The only sentencing exhibit sent by the trial court was exhibit number six, which is a collective exhibit of certified copies of judgments against the Defendant. The presentence report, exhibit two, was still not included. On May 11, 2015, the Defendant filed a motion for this court to take judicial notice of the video recordings currently in the co-defendant's

appellate record, see State v. Adam Dansby Frazier, No. M2014-01027-CCA-R3-CD, 2015 WL 3623313 (Tenn. Crim. App. June 11, 2015), and included copies of the remaining exhibits, but these were not certified as required by our rules. He also requested consolidation of the two appeals. We granted his request to take judicial notice of the co-defendant's record[8] but denied any consolidation of the appeal given the different paths the two cases had taken up to that date.

"It is the duty of the appellant to prepare a record that conveys a fair, accurate, and complete account of what transpired in the trial court with respect to the issues that form the basis of the appeal." State v. Robinson, 73 S.W.3d 136, 154 (Tenn. Crim. App. 2001); see Tenn. R. App. P. 24(b). Our inclination is to waive all of the Defendant's sentencing issues for lack of a complete appellate record in the face of our attempts to alleviate the defects in the sentencing exhibits. However, our supreme court has cautioned, in sentencing cases, that if "the record is adequate for a meaningful review, the appellate court may review the merits of the sentencing decision with a presumption that the missing [evidence] would support the ruling of the trial court." State v. Caudle, 388 S.W.3d 273, 279 (Tenn. 2012) (citing State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991)).[9] The Caudle court concluded that "the mere fact that the [sentencing evidence] was not made a part of the record on appeal should not preclude review under the standard adopted in Bise." Id.

Accordingly, we will dispense with the Defendant's argument on the merits. On appeal, the Defendant argues that the trial court erred in applying enhancement factors (6) and (10) and by failing to apply mitigating factors (1) and (4) to his conviction for facilitation of attempted second degree murder. The Defendant does not challenge the application of the remaining two factors, leaving (1) and (13) applicable even if we were to accept the Defendant's argument as true. We likewise believe the record supports application of factors (1) and (13) to the Defendant's facilitation conviction. It is clear from the transcript that the Defendant had a lengthy criminal history in addition to that necessary to establish the appropriate range and that he was incarcerated for a felony conviction at the time of the offense.[10] See Tenn. Code Ann. § 40-35-114(1) & (13).

---

[8] It is only because of our painstaking efforts that we were presented with an adequate record to conduct meaningful appellate review of the sufficiency of the evidence supporting the Defendant's various convictions. We also note that the Defendant's presentence report was not mistakenly included in the co-defendant's appellate record.

[9] Caudle addresses a missing guilty plea transcript in a sentencing case, but we see no reason why the same rationale would not extend to the circumstances presented here.

[10] The trial court noted the Defendant's "numerous prior convictions[,]" which included "at least five misdemeanors and six felonies."

-24-

The State agrees with the Defendant that both enhancement factors (6) and (10) were improperly applied to the Defendant's conviction for facilitation of attempted second degree murder. In his initial brief, the Defendant argues only that the proof was insufficient to support these factors. The State responds to the Defendant's argument by citing to <u>State v. James Earl Garrett, Jr.</u>, No. M2010-01391-CCA-R3-CD, 2011 WL 3689323, at *3 (Tenn. Crim. App. Aug. 23, 2011), and conceding that both of these factors "are necessarily included with the offense of facilitation of second degree murder." The Defendant, in his reply brief, simply states, "[T]he Defendant would agree with the State that the [c]ourt misapplied half of the enhancement factors." We disagree with both parties on all counts.

It is true that factor (6), that the injuries inflicted upon the victim were particularly great, is necessarily included within the offense of facilitation of second degree murder. <u>See</u> <u>Garrett</u>, 2011 WL 3689323, at *3. However, factor (6) is not likewise an included element in the crime of facilitation of <u>attempted</u> second degree murder. <u>See</u> <u>State v. Myron McNeal</u>, No. W2010-01130-CCA-R3-CD, 2012 WL 543054, at *5 (Tenn. Crim. App. Feb. 16, 2012) (applying enhancement factor (6) to sentence for conviction of attempted second degree murder) (citing <u>State v. Alexander</u>, 957 S.W.2d 1, 7 (Tenn. Crim. App. 1997) ("[P]ersonal injuries, great or small, are not an element of attempted murder.")). Although the risk of serious injury may be inherent in an attempted murder, an actual injury is not an element of the offense. Here, Officer Miller suffered from multiple stab wounds that left her with permanent scarring and injuries that will affect her mobility for the rest of her life. Due to her injuries, she was unable to return to work at the Turney Center. We hold that the trial court did not err by finding factor (6) applicable to the Defendant's facilitation of attempted second degree murder conviction.

We also disagree that factor (10), the Defendant had no hesitation committing a crime where the risk to human life was high, was wrongly applied here. Previously, this court has held that when enhancement factor (10) is inherent in the charged offense, it may still be applied to enhance a sentence where a defendant's actions created a risk of harm to an individual other than the named victim. <u>See, e.g., State v. Joe Carpenter Tyree</u>, No. M2006-02173-CCA-R3-CD, 2007 WL 2295611, at *8 (Tenn. Crim. App. Aug. 10, 2007); <u>see also</u> <u>State v. Imfeld</u>, 70 S.W.3d 698, 707 (Tenn. 2002). That was precisely the rationale of the trial court here:

> There were many other individuals and people around which I am satisfied is a powder keg waiting to explode under the best of circumstances. And then to have this type of conduct going on certainly increases the risk to human life, not only to the other officers who were working there but the other inmates within the pod.

Moreover, the Defendant argues that there was "no evidence that he had any knowledge that the incident taking place around him caused a high risk to human life"; that he did nothing more "than swing a sock with an unidentified object [in it] a few times"; and that there was no evidence he "knew that anyone else around him possessed a knife." These assertions are completely contradicted by the evidence presented at trial and at the sentencing hearing that the Defendant openly brandished a weapon in this penal facility, which he used in an attack on two prison guards; that Officer Miller suffered injuries from this weapon; that co-defendant Frazier was walking around with a knife visibly in his hand; that he was involved in a standoff with another group of inmates just before the attack; and that he had just been involved with these same two co-defendants in a stabbing attack on two other inmates, which was what caused the "code" calling for lock-down in the unit in the first place. The evidence does not preponderate against the trial court's finding, and therefore, this factor was properly applied.

The Defendant suggests that his conduct neither caused nor threatened serious bodily injury to Officer Miller and that he played a minor role in the commission of the offense. See Tenn. Code Ann. § 40-35-113(1) & (4). From the Defendant's actions in the facilitation of the attempted murder of Officer Miller, the trial court could certainly conclude that Officer Miller suffered serious bodily injury regardless of whether the object the Defendant used was ever recovered. Additionally, the trial court stated that, "in the [c]ourt's mind, [the Defendant] appeared to be the leader," although the jury saw it differently. Just because the Defendant was convicted of facilitation does not necessarily equate to a finding that he played "a minor role in the commission of the offense." The trial court's decision not to apply these factors in mitigation is supported by the record.

Next, regarding the possession of contraband in a penal institution conviction, we have already found that factors (1) and (10) were properly applied and, accordingly, would likewise apply to this conviction. In his reply brief, the Defendant argues that the trial court erred by applying enhancement factor (13)—at the time the felony was committed, the Defendant was incarcerated in a penal institution on a felony conviction—because "this factor is actually an element of the crime that he was convicted of[.]" See Tenn. Code Ann. § 40-35-114(13). This court has previously addressed the Defendant's argument regarding enhancement factor (13) and found it to be without merit; ironically, this is the same case cited to earlier by the Defendant. See Eads, 2008 WL 2790434, at *11 (holding that "a defendant's incarceration is not an essential element of the offense of possession of contraband in a penal institution"). Thus, we find no abuse of discretion in the application of any of the three enhancement factors to the Defendant's possession of contraband in a penal institution conviction.

-26-

The Defendant again argues that trial court erred in failing to apply mitigating factor (1), this time because his possession of "a blunt object wrapped in a cloth does not cause or threaten serious bodily injury." The Defendant ignores all evidence to the contrary that he did much more than possess this weapon but indeed used it to strike Officer Miller causing bodily injury. Finally, he contends that mitigating factor (11) applied, "The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct[.]" See Tenn. Code Ann. § 40-35-113(11). He submits that he never had any intent to violate the law; however, the jury determined otherwise. Moreover, the Defendant again ignores the testimony at the sentencing hearing that he was involved with these two co-defendants in the immediately preceding attack on two inmates and additional testimony that he had been involved in other incidents while incarcerated. The trial court was clearly merited in choosing not to apply these mitigating factors.

Importantly, what both parties fail to recognize is that, prior to the individual rulings, the trial court collectively placed great emphasis on the circumstances surrounding these three defendants' conduct. The trial court stated, "[c]ertainly in this case the nature and characteristics of the criminal conduct involved is an overriding consideration for the [c]ourt as it was for the [j]ury." Addressing all three defendants, the trial court found as follows:

> All three [d]efendants were major players in this conduct and bringing about this offense in a place that's a very dangerous place to begin with where citizens who are willing to work in a dangerous environment, like a penal facility, are placed to do nothing more than try to earn a living and maintain order among violent offenders and violent people. So the conduct that the [c]ourt witnessed on the video and that the [j]ury witnessed is nothing short of brutal. I don't know what other word describes the conduct of all three of these gentlemen that was inflicted on these two employees who were trying to earn a living and do the right thing by their families in guarding people, t[hree] individuals who have already been found to be violators of society's rules and laws. And all of that has to come into play with the conduct that I saw on the video as well, and certainly as the [j]ury saw in rendering their verdict of attempted second degree murder at least against a couple of these [d]efendants.
>
> But all of the [d]efendants' conduct in the [c]ourt's mind from the time that they got involved with the altercation, immediately before the stabbing of the guards, until the time that they had to be coerced out of their cells to face the music on this charge is just . . . nothing short of brutal, severe, vicious and inexcusable. And inexcusable seems like such a light

word to place on this conduct, but there's just no excuse for the blood-thirsty type conduct that these three engaged in. Perhaps blood-thirsty is a better word.

We conclude that the record supports the trial court's application of enhancement factors (1), (10), and (13) to both of the Defendant's ten-year sentences for facilitation of attempted second degree murder and possession of contraband in a penal institution and of enhancement factor (6) to the facilitation of attempted second degree murder conviction. Regardless, as stated above, "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. In accordance with the broad discretion now afforded a trial court's sentencing decision, a sentence imposed by the trial court within the appropriate range should be upheld so long as the sentence is consistent with the principles and purposes of the Act, regardless of the presence or absence of mitigating and enhancement factors. Id. The trial court in this case thoroughly considered the purposes and principles of the Sentencing Act in rendering its decision; therefore, we discern no abuse of discretion, and the imposition of the maximum sentences in the range is affirmed.

## CONCLUSION

Based upon the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE